# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LARRY P. HARMAN D.O.,

     Plaintiff,

v.                                        CASE NO. 8:18-cv-1441-KKM-TGW

STANDARD INSURANCE
COMPANY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     In this suit, the plaintiff, Dr. Larry P. Harman, seeks recovery from defendant Standard Insurance Company on a disability insurance policy. In a motion for summary judgment (Doc. 59), the defendant contends that the Policy is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001–1461 ("ERISA"). The plaintiff disputes that contention and has filed a motion for partial summary judgment seeking to strike a defense that asserts ERISA (Doc. 60). Both motions have been referred to me for a report and recommendation (Doc. 69).

     The law regarding ERISA in circumstances like those presented here is far from clear. However, I find most persuasive the view expressed by the First Circuit in Demars v. CIGNA Corp., 173 F.3d 443 (1st Cir. 1999),

that ERISA does not apply.  Accordingly, I recommend that the plaintiff's motion for partial summary judgment be granted on the defendant's tenth affirmative defense, which asserts ERISA.

The defendant in its summary judgment motion contends alternatively that, if ERISA does not apply, the plaintiff's claim fails because he is legally precluded from practicing medicine because of the surrender of his license and not because of a disability.  That contention has merit because the plaintiff has not come forward with probative evidence showing that he became factually disabled before he surrendered his license.  Therefore, I recommend that the defendant's motion for summary judgment be granted.

I.

The plaintiff, Larry P. Harman, D.O., is a cardiac electrophysiologist (Doc. 59-8, p. 2) who previously resided in Illinois and was employed by Caleel and Associates (Doc. 59, pp. 2–3).  On October 10, 1996, the plaintiff, through his employer, was issued a Disability Income Policy (the Policy) with the number 2-080-015H (see Doc. 2, p. 5) by Minnesota Mutual Life Insurance Company.  The Policy was assumed by the defendant, Standard Insurance Company, in 2001 (Doc. 59, p. 4).  The Policy insures the holder against lost income due to disability, as defined under the Policy, for each month the holder cannot engage in his regular

occupation (Doc. 2, p. 1).

In 1999, the plaintiff left his employment with Caleel and Associates and moved to Florida (Doc. 60, p. 2). Caleel and Associates continued paying the Policy premiums through October 18, 1999 (Doc. 59, p. 3). The Policy lapsed due to nonpayment of the premium on October 10, 1999 (Doc. 63-1, p. 2). However, the plaintiff sought to have the Policy reinstated and to obtain additional benefits through a change application. Accordingly, the plaintiff mailed two checks on January 13, 2000 — one to reinstate the original Policy and one to exercise a Future Income Protection Agreement (FIPA) option (id.). The FIPA option increased his monthly benefit by $1,220 per month (Doc. 59, p. 4).

The Policy was reissued January 10, 2000 (Doc. 2, p. 5).[1] It defines "disability" as follows (id., p. 15):

> You have a disability if, because of continuing sickness or injury, you:
>
> > (1) are under the regular, reasonable and customary care of a physician; and
> > (2) are unable to engage in your regular occupation but, because of continuing disability, are earning not more than 85% of your prior average earned income; and
> > (3) are earning not more than 85% of your

---

[1] Page one states, "This policy has been reissued effective Jan 10 2000. The original page 1 and any reissues in effect prior to Jan 10 2020 are superseded by this page 1." (Doc. 2, p. 5).

> prior average earned income from your
> regular or any other occupation.

The plaintiff established a medical practice in Florida and obtained privileges at Sarasota Memorial Hospital. In February 2012, a nurse at that hospital made a sexual harassment complaint against him (Doc. 59, p. 4). In January 2014, more female staff at the hospital made complaints against Dr. Harman (id.). In February 2014, after the plaintiff met with the hospital's Chief of Staff to discuss the allegations, the hospital required him to self-report to the Professional Resource Network (PRN), a contracted consultant, for evaluation specifically for doctors with boundary issues (id., pp. 4–5). PRN referred the plaintiff for a psychiatric exam with Theodore Treese, M.D., who in turn referred him for a psychological assessment with Nicholas Anthony, Ph.D. Dr. Anthony opined that the plaintiff did not have a psychiatric disorder (id., p. 5). In March 2014, the plaintiff sat for a polygraph and denied the sexual harassment allegations, but he failed the polygraph (id.). On May 12, 2014, PRN required the plaintiff to voluntarily withdraw his Florida medical license while he was undergoing treatment (id., p. 6).

PRN referred the plaintiff to the Professional Resource Center (PRC), an outpatient center in Kansas, for treatment. He reported to PRC on May 22, 2014 (id.). Following his treatment from May to July 2014, the

4

plaintiff was permitted to return to work as long as he followed a five-year monitoring contract with PRN (id., pp. 6–7). The plaintiff returned to work in Florida on October 31, 2014 (id., p. 7). From October 2014 through April 27, 2015, the plaintiff complied with PRN's requirements and was successfully practicing medicine (id., p. 8).

On April 28, 2015, the plaintiff fell out of compliance with his monitoring contract after failing his second polygraph (id., p. 9). PRN withdrew the plaintiff from practice on April 30, 2015, and required him to return to PRC for treatment (id.). The plaintiff was treated at PRC in May 2015; in therapy sessions he discussed the possibility of retiring rather than continuing to practice medicine (id.; Doc. 59-8, p. 20). PRC gave the following recommendation (Doc. 59-8, p. 23):

> Given that Dr. Harman demonstrated reactivity on four separate polygraph evaluations (one in Florida and three at PRC), his inability to explain reasons for that, and his inconsistency in reports about some elements of his sexual behavior, the team is not able to endorse Dr. Harman's return to clinical practice at this time.

During a May 23, 2015, conference call with PRN, the plaintiff "expressed interest in voluntarily relinquishing his license" (Doc. 59-9, p. 1). He left PRC that day (id.). On June 11, 2015, the Board of Osteopathic Medicine approved Dr. Harman's request to voluntarily relinquish his

Florida medical license (id., p. 13). However, the plaintiff maintained active licenses to practice medicine in Indiana and Illinois, and an inactive license in California (Doc. 64, p. 2).

In January 2016, the plaintiff started treatment with a psychiatrist, Matthew J. Edlund, M.D., for depression and sleep disorder (Doc. 59-10, pp. 3–6). The plaintiff filed a claim for disability benefits on March 29, 2016, alleging that he was unable to work due to depression and sleep disorder (Doc. 59-8, pp. 2–5). The plaintiff sought benefits from May 13, 2014 to October 19, 2014; December 1, 2014 to December 5, 2014; May 2, 2015 to May 24, 2015; and June 10, 2015 to present (id., p. 7).

The defendant denied the plaintiff's application for benefits on November 3, 2016, stating that Dr. Harman did not have "a sickness or injury preventing [him] from engaging in [his] regular occupation of cardiologist" (Doc. 59-9, p. 26). The plaintiff appealed, and the defendant upheld its decision on April 14, 2017 (Doc. 59-9, pp. 29–30).

In May 2018, the plaintiff filed a complaint in Florida state court against Standard Insurance Company (Doc. 60, p. 3). The defendant removed the case to federal court, alleging diversity jurisdiction under 28 U.S.C. 1332 (Doc. 1, pp. 2–7). The defendant does not allege federal question jurisdiction under 28 U.S.C. 1331 (see id.).

After the parties conducted discovery, the defendant filed a motion for summary judgment that was referred to me by Chief United States District Judge Steven D. Merryday (see Docs. 19, 36). A hearing was held before me on the motion for summary judgment and a discovery motion filed by the defendant (see Doc. 45). Due to discovery violations by the plaintiff, the defendant's motion for summary judgment was denied without prejudice (see Doc. 47).

On July 1, 2020, the defendant filed the present motion for summary judgment (Doc. 59), and the plaintiff filed its partial motion for summary judgment (Doc. 60). The motions were referred to me for a report and recommendation (see Doc. 69). I held a hearing on the motions (see Doc. 71).

## II.

Summary judgment is appropriate only when the court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" after reviewing the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(a), 56(c)(1)(A). Issues of fact are

7

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. Id. The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." Id. at 325. In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).

### III.

The defendant moved for summary judgment on the following grounds: (1) the plaintiff's breach of contract claim "is preempted by ERISA and recast as a claim for benefits under ERISA"; (2) the de novo standard of review applies under ERISA, and the defendant's decision to deny the plaintiff's claim was correct because the plaintiff is not disabled due to illness; rather, the plaintiff voluntarily relinquished his Florida medical license; (3) alternatively, Illinois law applies to the plaintiff's breach of

contract claim, and his attorney's fee claim under Florida law fails; and (4) the defendant did not breach the Policy because the plaintiff cannot practice medicine due to legal, not factual, disability (Doc. 59, p. 2).

The plaintiff moved for partial summary judgment as to the defendant's ninth and tenth affirmative defenses (Doc. 60, p. 1). The defendant's ninth affirmative defense is that Dr. Harman "is not entitled to attorney's fees under Fla. Stat. § 627.428 because his disability [Policy] was not issued in Florida," and the tenth affirmative defense asserts that ERISA governs the Policy (id.). The plaintiff moved for partial summary judgment on the grounds that: (1) Florida law applies because the Policy was reissued in Florida; and (2) ERISA does not apply (id., pp. 3, 4).

## A. Breach of contract or ERISA.

The primary issue disputed by the parties is whether the plaintiff's claim for benefits is subject to ERISA. Thus, the question is whether the plaintiff's individual policy — although initially established under ERISA — is still subject to ERISA. As United States District Judge Charlene Edwards Honeywell has accurately stated: "The issue of whether an individual policy is removed from the scope of ERISA when it is converted from an employer's group plan is a well-contested issue within the federal courts." D'Aprile v. Unum Life Ins. Co. of America, 2011 WL

13140719, *5 (M.D. Fla. Mar. 30, 2011).  As indicated, I find the view that ERISA does not apply in this situation better reasoned and more persuasive.

Under ERISA, a claimant may bring a claim for relief for benefits under the terms of a "plan" governed by that Act.  Consequently, an individual who qualifies as a "participant" in such a plan must bring a claim for benefits under ERISA's civil enforcement mechanism.   29 U.S.C. 1132(a)(1)(B).

ERISA preempts "any and all state laws insofar as they ... relate to an employee benefit plan." 29 U.S.C. 1144(a).  It is well-settled that state-law claims for breach of contract are preempted by ERISA.  See Butero v. Royal Maccabees Life Inc. Co., 174 F.3d 1207, 1215 (11th Cir. 1999).

The Eleventh Circuit has established certain requirements that must be met for any employee benefit plan to fall within the purview of ERISA.  To fall under the scope of ERISA, a plan must be:

> (1) [A] "plan, fund, or program" (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

Donovan v. Dillingham, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc).  To determine whether a plan is subject to ERISA, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits."  Id. at 1373.

"A plan is 'established' where the employer takes active steps, evidencing more than a mere intent to confer a benefit, in implementing a policy."  D'Aprile v. Unum Life Ins. Co. of America, supra, 2011 WL 13140719 at *3.  The Eleventh Circuit has provided relevant, non-exclusive considerations for determining whether an ERISA plan has been maintained:

> (1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of funds to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of the employees; and (7) the employer's intent.

Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1265 (11th Cir. 2004).

As indicated, Judge Honeywell has noted (echoing a statement by United States District Judge Susan C. Bucklew) that "whether an individual policy is removed from the scope of ERISA when it is converted from an employer's group plan is a well-contested issue within the federal courts."  D'Aprile v. Unum Life Ins. Co. of America, supra, 2011 WL

11

13140719 at *5. That statement is reflected by the range of opinions in cases from this district alone. Thus, in D'Aprile, Judge Honeywell stated that "when, as is the case here, the employment relationship has been terminated, courts are loath to find continued participation" in a plan covered by ERISA. Id. at *6. She added, "cases considering whether ERISA applies to converted plans have almost universally found that a former employee's individually-paid coverage is exempt from ERISA preemption." Id.

Judge Bucklew expressed a similar conclusion in Gatewood v. Life Ins. Co. of North America, 75 F.Supp.2d 1347 (M.D. Fla. 1999). There, she said that "plaintiff's converted individual policy is not subject to ERISA preemption" because the plaintiff's employer had no "ongoing administrative and financial ties to the policy." Id. at 1350. I note, however, that Judge Bucklew's statement was dicta because she found that the claim for benefits was made before the policy was converted from an ERISA policy to an individual one.

On the other hand, United States District Judge Gregory Presnell has said "once ERISA, always ERISA." Stern v. Provident Life and Accident Ins. Co., 295 F.Supp.2d 1321, 1327 (M.D. Fla. 2003). Also, the defendant cites a decision by United States District Judge Marcia Morales Howard, adopting a report and recommendation by United States Magistrate

Judge Patricia D. Barksdale, finding that a policy was governed by ERISA. Clark v. Unum Life Ins. Co. of America, 95 F.Supp.3d 1335 (M.D. Fla. 2015). That decision is distinguishable because the plaintiff's employer bought the plaintiff a policy as a benefit, and that policy stayed with her when she changed employers so that the policy was never "converted." Id. at 1352.

   With respect to the decisions from this district, the decisions from Judge Honeywell and Judge Bucklew are well-founded. In particular, Judge Bucklew considered the reasoning of Demars v. CIGNA Corp.,173 F.3d 443 (1st Cir. 1999) to be persuasive. So do I.

   In Demars, the First Circuit stated:

> In passing ERISA, Congress's purpose was twofold: to protect employees and to protect employers. *See McMahon*, 162 F.3d at 35–36. Congress wanted to safeguard employee interests by reducing the threat of abuse or mismanagement of funds that had been accumulated to finance employee benefits, *see Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), while at the same time safeguarding employer interests by eliminating "the threat of conflicting and inconsistent State and local regulation" of employee benefit plans, *Travelers*, 514 U.S. at 657, 115 S.Ct. 1671 (quoting 120 Cong. Rec. 29197 (1974)).

> Neither concern seems to be strongly implicated here. There is little threat of abuse of funds in the ERISA sense. While there is a risk that funds accumulated to finance benefits under the conversion policy could be mismanaged or

13

abused, there is no risk of Demars's former employer abusing or mismanaging these funds, since it does not control them, or indeed have any tie to them. Rather, it is the insurers who issued the policy—defendants here—who are in a position to possibly abuse or mismanage the funds. Yet Congress placed into ERISA an express disavowal of any intent to regulate insurers *qua* insurers. *See* 29 U.S.C. § 1144(b)(2).

The uniformity of regulations concern is equally attenuated. While conversion policies like Demars's undoubtedly impose an administrative burden, that burden lies on the insurers who provide the policy, not on the former employer. As *Fort Halifax* noted, "Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises ... with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax*, 482 U.S. at 11, 107 S.Ct. 2211. Thus, "an employee benefit may be considered a plan for purposes of ERISA only if it involves the undertaking of continuing administrative and financial obligations by the employer." *Belanger*, 71 F.3d at 454. Under this analysis, conversion policies are not ERISA plans, because employers do not bear any administrative or financial responsibility for them.

173 F.3d at 446.

That same reasoning applies to Dr. Harman's case.  Thus, the plaintiff under the Policy faces no threat of abuse or mismanagement of funds by an employer. Further, there is no employer involved who could be

14

subject to the threat of conflicting and inconsistent state and local regulations because employers do not bear any administrative or financial responsibility for converted policies.   Accordingly, such policies are not reasonably considered ERISA plans.

Further, in this case there are additional factors that support this conclusion.   Thus, the Disability Policy was obtained for the plaintiff by Caleel and Associates in Illinois as an incident of employment.   The plaintiff's employment was terminated in 1999, and he moved to Florida to practice medicine by himself.   Consequently, Caleel and Associates stopped paying the premiums for the Policy, and the Policy lapsed.

The plaintiff subsequently had the Policy reinstated, which he did by paying the premiums himself.   At that time, he also exercised an option to increase the potential benefits.   That act required a policy change application (Doc. 59-10, p. 13).   On that form, the agent was asked "is the purpose of this insurance to provide an Employee benefit Plan as defined under ERISA," and the agent marked "No" (id., p. 23).   The form asked further "[a]re administrative services for this pension plan provided by Minnesota Mutual," and again he checked "No" (id.).

The defendant responds by pointing out that the policy number did not change and neither did the insurance agent.   In my view, those

circumstances do not outweigh the fact that the plaintiff's employment terminated, his policy lapsed, he began paying the premiums, he filled out a policy change application to exercise an option for greater benefits, and his agent indicated that it was not an ERISA policy.

In all events, the basic factors the First Circuit stated in <u>Demars</u> that underlie ERISA are not present here. Thus, the present circumstances do not present a threat of abuse or mismanagement by an employer, and there is no employer who would be subject to administrative burdens. Consequently, the plaintiff's Policy should not be covered by ERISA.[2]

## B. **Disability.**

The defendant argues, alternatively, that even if ERISA does not apply, the plaintiff's claim for disability benefits fails because a legal disability — not a factual disability — prevented him from engaging in his regular occupation. Because the plaintiff has not provided the court with probative evidence showing he was factually disabled prior to his legal disability in June 2015, his claim for benefits fails.

---

[2]This conclusion defeats the defendant's ancillary contention that the plaintiff is not entitled to a jury trial (see Doc. 59, pp. 17–18). Similarly, the argument that ERISA defeats the application of attorney's fees under Fla. Stat. § 627.428 is unavailing (see id.). Further, whether § 627.428 will come into play will be moot if, as I recommend, the plaintiff's claim for benefits is rejected.

16

The defendant analogized Dr. Harman's situation to the plaintiff in Pogue v. Northwestern Mutual Life Insurance Company, 2019 WL 1376032 (6th Cir. 2019). In Pogue, the Sixth Circuit determined that the plaintiff had a legal disability that preceded the onset of his factual disability. The court explained the difference between factual and legal disability as follows:

> "A factual disability is an incapacity caused by illness or injury that prevents a person from engaging in his or her occupation," whereas "[a] legal disability includes all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so." Id. (citing Provident Life & Accident Ins. v. Fleischer, 26 F. Supp. 2d 1220, 1223 (C.D. Cal. 1998); Solomon v. Royal Maccabees Life Ins., 622 N.W.2d 101, 104 (Mich. Ct. App. 2000)). A legal disability may result from incarceration, the suspension of a professional license, surrendering a professional license as part of a plea agreement or to avoid disciplinary action, or practice restrictions imposed by a licensing board. Id. (collecting cases).

Id. at *2. "If the legal disability preceded the onset of the factual disability, the claimant is not entitled to disability benefits." Id. at *3.

The Sixth Circuit outlined the following questions that courts ask to determine whether a claimant is entitled to disability benefits:

> (1) is the claimed factual disability medically bona fide; (2) did the onset of the medically bona fide

17

> factual disability actually occur before the legal
> disability; and (3) did the factual disability actually
> prevent or hinder the person seeking disability
> benefits from engaging in his or her profession or
> occupation?

Id.

The facts in this case establish that Dr. Harman's legal disability preceded the onset of his factual disability. It is the plaintiff's responsibility to set forth evidence showing Dr. Harman was disabled earlier than the time he relinquished his license on June 10, 2015.[3] He has plainly failed to do that.

To start with, the plaintiff began being monitored by PRN not because of some deficient performance in his medical practice due to some mental impairment. Rather, he came under their scrutiny due to allegations of sexual misconduct. PRN had the plaintiff evaluated by a psychologist and a psychiatrist. He also took a polygraph test, which he failed with respect to questions regarding sexual conduct.

At that point, PRN required the plaintiff to complete a Voluntary Withdrawal Practice Form, which the plaintiff completed on May 12, 2014 (Doc. 59, p. 6). His Florida medical license could be returned upon

---

[3]The plaintiff's attorney's letter regarding the surrender of the license has an obvious typographical error. It reads "June 10, 2014" instead of June 10, 2015, which is when the plaintiff relinquished his license. See Doc. 59-9, p. 2.

successful completion of treatment at the residential program.

The plaintiff was referred to the Professional Resource Center (PRC), an outpatient center in Kansas, for treatment from May 2014 through July 2014 (id.). When he was discharged, the doctors at PRC opined that he "was not impaired by virtue of chemical dependency, a severe mood disorder, cognitive disorder, a thought disorder, a psychotic process, dissociative processes, pathological aggression, psychopathy, or impulse control disorder" (Doc. 59-4, p. 47).[4]

Dr. Harman left PRC and returned to work in October 2014 (Doc. 59-6, p. 11). The plaintiff was under a five-year monitoring contract with PRN, which required him to sit for more polygraph tests, among other obligations (Doc. 59, p. 7). The plaintiff stated in his deposition that "[t]hings were running smoothly" at this time (Doc. 59-2, p. 9). However, after failing a polygraph in April 2015, PRN again withdrew the plaintiff from practice and required him to return to PRC in Kansas (Doc. 59, p. 9). At PRC, he failed a polygraph test three more times. As a result, PRC could not endorse the plaintiff's return to clinical practice (id., p. 10).

---

[4]The plaintiff's diagnostic formulation was "Occupational Problem; Partner Relational Problem; Cocaine abuse, History of cocaine abuse, in sustained remission; Cannabis abuse in remote history, in sustained reported remission; Cluster B traits; Hypertension; High cholesterol; Obesity; Occupational stressors" (Doc. 59-4, p. 46).

On May 23, 2015, PRN had a conference call with the plaintiff and the team at PRC (id.).  During that call, the plaintiff indicated that he was interested in voluntarily relinquishing his medical license and returning to Florida.  The plaintiff left PRC that day.  On June 10, 2015, the plaintiff, through his attorney, gave up his license (Doc. 59-9, p. 2).  The plaintiff states that he "gave up on PRN" and turned in his Florida medical license because the program only provided treatment goals, but no plan for how to meet the goals (Doc. 64, p. 7).

The plaintiff sought treatment in November 2015 from his family doctor, Arthur Magrann, complaining of depressed mood due to PRN, his failed marriage, and the death of his father (id.).  Dr. Magrann referred the plaintiff to a psychiatrist, Dr. Lose, who opted not "to see him because he was eighty years old, and Dr. Harman was too complex a case" (id.).  The plaintiff then sought treatment with Dr. Matthew J. Edlund, who specializes in psychiatry and sleep medicine (id.).  The plaintiff first saw Dr. Edlund on January 18, 2016.

Dr. Edlund opined the plaintiff could have "had depressive symptoms in 2013 following his father's death and his wife leaving him" (Doc. 64, p. 5).  He diagnosed the plaintiff with major depression, circadian dysrhythmia, and REM behavior disorder (Doc. 64, pp. 7–8).

Dr. Edlund's evidence does not raise a genuine dispute of fact whether the plaintiff's surrender of his license on June 10, 2015, preceded Dr. Edlund's opinion on January 18, 2016, that the plaintiff is disabled from his occupation due to major depression and a sleep disorder. Notably, the plaintiff does not meet the defendant's contention head-on. Rather, he essentially argues that the plaintiff was opined by Dr. Edlund to then be disabled from practicing his specialty (see Doc. 64, p. 7). That contention misses the defendant's point.

In all events, Dr. Edlund's evidence does not answer the defendant's argument that the plaintiff's legal disability preceded any factual disability. The most that Dr. Edlund indicated that is pertinent is that the plaintiff had problems in 2013 because his father died and his wife left him. But he qualified that by stated that it is "conceivable" that the plaintiff had depressive symptoms in 2013 (Doc. 31-1, p. 6). A retrospective opinion like Dr. Edlund's has been rejected as too speculative. Goomar v. Centennial Life Ins. Co., 855 F.Supp. 319, 326 (S.D. Cal. 1994) ("[R]etrospective expert testimony regarding the existence or onset of a mental illness is inadmissible speculation."). That is certainly so where Dr. Edlund has simply said that it is "conceivable" that the plaintiff had depressive symptoms in 2013. Further, he did not state that the plaintiff could not work at his occupation because of

21

that condition in 2013. Consequently, Dr. Edlund's opinion does not provide probative evidence that the plaintiff was factually disabled from his occupation before he surrendered his license on June 10, 2015.

Even more significant, any weight that Dr. Edlund's opinion might have is negated by the fact that the plaintiff worked at his occupation for several months. Thus, PRN approved the plaintiff's return to work on October 15, 2014, and he returned on October 31, 2014 (Doc. 59-6, p. 11). He worked through April 27, 2015, and his practice was running smoothly (Doc. 59, p. 8). However, the next day, he failed a polygraph, which resulted in a return to PRC (id., p. 9). During that period at PRC, the plaintiff decided to surrender his license. In other words, contrary to any suggestion Dr. Edlund may have made about the plaintiff's ability to work months before he first saw the plaintiff, the plaintiff did in fact work for several months right to about the time he gave up his license. In my view, this circumstance conclusively establishes that the plaintiff became legally unable to practice medicine before he became factually disabled from doing so.

Although the plaintiff relies primarily upon Dr. Edlund, he also makes a statement that "Dr. [Felix J.] Subervi has also determined that Dr. Harman suffers from major depression and is unable to perform work as a cardiac electrophysiologist because of it" (Doc. 64, p. 8). Dr. Subervi, a

22

psychologist, was retained as an expert witness and first saw the plaintiff on March 19, 2019 (Doc. 31-3, p. 3), which was almost four years after the plaintiff surrendered his license. The plaintiff makes no argument that Dr. Subervi's opinion relates back to a time before the plaintiff surrendered his license. And even if he did, the opinion would be inadmissible speculation. Goomar v. Centennial Life Insurance Co., supra, 855 F.Supp. at 326. Further, any such opinion would be refuted by the fact that the plaintiff worked up until about the time he surrendered the license.

The defendant also points out with some force that the plaintiff on July 29, 2015, signed a renewal application for his medical license in California (Doc. 59, p. 10). In doing so, he answered "no" under penalty of perjury to the question: "Do you have any physical, mental, emotional or behavioral disorder that would impair your ability to practice medicine safely?" (Doc. 59-10, p. 77). This answer also undermines the plaintiff's claim.

In April 2016, the plaintiff made a claim under the Policy seeking disability benefits from May 13, 2014, to October 19, 2014; December 1, 2014, to December 5, 2014; May 2, 2015, to May 24, 2015; and June 10, 2015 to the present (Doc. 59, p. 11).

Regarding the first period from May 13, 2014, to October 9, 2014, the plaintiff was being treated at PRC in Kansas, and his license had been withdrawn as required by PRN (Doc. 59, pp. 6–7). For the second period, December 1, 2014, to December 5, 2014, the defendant asserts that Dr. Harman could not work because his PRC monitoring contract prevented him from working that week (id., p. 19). For the third period, May 2, 2015, to May 24, 2015, the defendant posits that Dr. Harman was precluded from working because he failed a polygraph and fell out of compliance with his PRN monitoring contract (id.). Regarding the final period, June 10, 2015, to the present, the defendant asserts that the plaintiff was under a legal disability that preceded any factual disability.

The plaintiff did not make any specific response to the defendant's contentions regarding the first three periods. Thus, those contentions are undisputed and those claims are properly rejected.

The heart of the disability issue concerns the fourth period from June 10, 2015, to the present. As shown, the defendant has presented strong evidence that the claim fails because the plaintiff was legally disabled before he was factually disabled. The plaintiff, in response, has failed to come forward with any meaningful evidence. Consequently, the defendant is entitled to summary judgment on the plaintiff's claim for breach of contract.

24

IV.

For these reasons, I recommend:

A.    That the Defendant's Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 59) be denied to the extent that it contends that the plaintiff's breach of contract claim is preempted by ERISA, but be granted to the extent that the plaintiff's claim for breach of contract is dismissed.

B.    That the Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 60) be granted to the extent that ERISA does not apply.

Respectfully submitted,

_____
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: FEBRUARY *18*, 2021.

<u>NOTICE TO PARTIES</u>

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. 636(b)(1)(C).  Under 28 U.S.C. 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions.