UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LARRY P. HARMAN, D.O.,

     Plaintiff,

v.                            Case No. 8:18-cv-1441-KKM-TGW

STANDARD INSURANCE COMPANY,

     Defendant.

_____

## ORDER

The parties filed cross motions for summary judgment. (Docs. 59, 60.) Defendant Standard Insurance Company argues that the Court should grant summary judgment in its favor because the Employment Retirement Income Security Act (ERISA) governs the plaintiff's breach-of-contract claim and, under ERISA, Standard correctly determined that Plaintiff is not entitled to disability benefits under his insurance plan. (Doc. 59 at 2.)[1] Plaintiff Larry Harman argues that the Court should grant summary judgment on two of Standard's affirmative defenses because Florida law—not ERISA—applies to Harman's claim, including his demand for attorney's fees. (Doc. 60 at 1–2.)

---

[1] Alternatively, Standard moves for summary judgment on the ground that, under Illinois law, which Standard argues applies to Harman's claim, Standard did not breach the terms of Harman's insurance policy because his inability to practice medicine is due to a legal disability, not a factual disability. (Doc. 59 at 2.)

Following an order referring the parties' motions for summary judgment, the Magistrate Judge issued a Report and Recommendation. (Doc. 75.) That report recommends granting Harman's motion for summary judgment to the extent Harman argues that ERISA does not govern his insurance policy with Standard. (*See id.*) But the report also recommends granting Standard's motion for summary judgment to the extent Standard argues that Harman's legal disability preceded his factual disability; therefore, Standard correctly denied Harman's disability claim and the Magistrate Judge recommends granting summary judgment to Standard on this basis. (*Id.*)

Both parties objected to the Report and Recommendation. (Docs. 76, 77.) Standard objects to the Magistrate Judge's conclusion that ERISA does not govern Harman's claims. (Doc. 76.) Harman objects to the Magistrate Judge's conclusion that Harman's legal disability preceded his factual disability, which would preclude all relief. (Doc. 77.)

After reviewing the relevant filings and evidence, the Court sustains Standard's objection and concludes that ERISA governs Harman's insurance policy because his former employer "established" the plan under which he obtained the reissued policy. Specifically, the Court concludes that Harman merely revived the policy his former employer initially "established" after it lapsed, and he has not so transformed the policy such that it is no longer the same one. Since ERISA covered the initial policy, it still applies post-

2

termination and conversion. Therefore, ERISA preemption applies to Harmon's insurance claims under the policy.

Ultimately, this first issue becomes academic, as the Court agrees with the Report and Recommendation's conclusion that Harman's legal disability preceded his factual disability. As a result, the Report and Recommendation is **ADOPTED-IN-PART**. Standard's objection to the report's resolution on the issue of whether ERISA governs Harman's insurance policy is **SUSTAINED**. The remaining objections are **OVERRULED**. Therefore, the Court **GRANTS** summary judgment in favor of Standard Insurance.

## I.   Legal Standards

The Court reviews de novo those portions of a Report and Recommendation to which parties object. *See* 28 U.S.C. § 636(b)(1)(C). The district judge may accept, reject, or modify the magistrate judge's findings or recommendations. *Id.*

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of a case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To overcome summary judgment, the opposing party must point to evidence in the record showing that a genuine issue for trial exists.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Neither Standard nor Harman object to the Magistrate Judge's factual findings. Rather, each party argues that the Magistrate Judge omitted "material facts." (Doc. 76 at 1–2 ("[T]he Magistrate Judge . . . omitted material facts from his analysis."); Doc. 77 at 2 ("[T]he Magistrate's R&R overlook[s] and omit[s] material facts which support [] Harman's claim for disability.").) As a result, the Court adopts the Magistrate Judge's factual findings. *See Harrigan v. Metro Dade Police Dep't Station #4*, 977 F.3d 1185, 1191 (11th Cir. 2020). Additionally, the Court considered the omitted facts discussed in the objections to the Report and Recommendation. (Docs. 76, 77.)

Having adopted the factual findings and considered the parties' proffered facts,[2] the Court will address why ERISA governs Harman's claims. Then, the Court will explain why Harman was legally disabled before the relevant time period.

## II.   Analysis

### a.   ERISA Governs Harman's Policy and Preempts His Contract Claim

The parties do not dispute some important facts. For instance, the parties agree that ERISA governed Harman's original insurance plan when he worked as a cardiac

---

[2] This order will discuss only those facts relevant to deciding the objections to the Report and Recommendation.

electrophysiologist with Caleel and Associates. And Harman puts forth no argument that his insurance policy falls within ERISA's safe harbor provisions. *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 n.2 (11th Cir. 2004). So, the dispute centers on whether ERISA continues to govern Harman's policy after he left his position with Caleel and Associates, allowed his policy to lapse, and then had it reissued. The Court concludes that *Glass v. United of Omaha Life Insurance Co.*, 33 F.3d 1341 (11th Cir. 1994), controls here and compels the conclusion that ERISA governs Harman's plan.

i. ERISA Governs Harman's Insurance Policy

ERISA covers employee benefit plans. 29 U.S.C. § 1003(a). An employee benefit plan is (1) a "plan, fund, or program" (2) established or maintained (3) by an employer (4) for the purpose of providing disability or other benefits (5) to participants or their beneficiaries. *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc). Whether ERISA governs a benefits plan is a question for the Court to decide. *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1266 (11th Cir. 2006).

Standard's objection to the Report and Recommendation turns on the meaning of "established." (Doc. 76.) Although the Eleventh Circuit has provided guidance on whether a plan is "maintained" such as to fall within the ambit of ERISA,[3] it has provided less

---

[3] The Eleventh Circuit directs courts to consider, in determining whether a plan is "maintained," the

clarity on the meaning of "established." It has instead instructed courts to consider "the surrounding circumstances" to determine if a plan was "established" by inquiring whether those circumstances would inform "a reasonable person" of the "intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan*, 688 F.2d at 1373. This deductive view of whether an employee plan has been "established" comports with the term's common legal meaning, defined as "to settle, make, or fix firmly; to enact permanently;" or "to make or form; to bring about or into existence." Black's Law Dictionary (11th ed. 2019).

And, most importantly as Standard argues, this Court must follow the Eleventh Circuit's only relevant precedent touching upon post-termination, conversion policies: *Glass v. United of Omaha Life Insurance Company*, 33 F.3d 1341 (11th Cir. 1994), which holds that a plan is established for ERISA preemption purposes if the right to enroll arose only from the initial ERISA plan and remained part of a group plan, *id.* at 1347. So, ERISA governs Harman's individual insurance plan if the reissued policy arose solely out

---

following:

> (1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of funds to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure to correct known perceptions of a plan's existence; (6) the reasonable understanding of the employees; and (7) the employer's intent.

*Anderson*, 369 F.3d at 1265 (quotation omitted).

of the policy Caleel and Associates initially established and if he remained part of the group plan after conversion.

Starting at the beginning, Harman's initial insurance plan was undeniably established by Caleel and Associates. When Harman began working for Caleel and Associates, he obtained disability insurance through his employer from Minnesota Mutual Life (later assumed by Standard). (Doc. 59-2 at 18–41.) Harman's policy included a Future Income Protection Agreement (FIPA) option. (Doc. 59-2 at 66–67.) Caleel and Associates paid premiums on Harman's insurance policy while he worked there and continued to do so for nearly two years after he ended his employment with them in 1998. (Doc. 59-2 at 21; Ex. 6 & 10.) And Harman enjoyed the employee group rate discount when paying the policy's premiums. (Doc. 59-2 at 43.)

Harman's policy lapsed in October 1999 due to nonpayment of premiums. (Doc. 63-1 at 2.) But in January 2000, Harman reapplied for his policy and exercised his FIPA option. (Doc. 63-1 at 2.) Harman's insurance policy reissued that same month. (Doc. 2 at 5.) The reissued policy bears the same policy number as when he worked with Caleel and Associates; lists the "Original Policy Date" as October 10, 1996; includes a stamped "Policy Amended" notice throughout; and enjoys the same discount based on the employee group rate. (Doc. 2 at 5; Doc. 59-2, Ex. 4.) Harman's policy also included his FIPA option. (Doc.

7

63-1 at 2.)

Harman argues ERISA no longer governs his reissued policy because Caleel and Associates no longer maintained Harman's reissued policy. (*See* Doc. 83 at 5.) This argument misunderstands the relevant inquiry. The pivotal issue is whether the reissued policy was "established"—not "maintained"—by Caleel and Associates. And it was.

Caleel and Associates established Harman's original policy that he received during his employment. After that plan lapsed, Harmon reinstated the policy, but he did not obtain a new individual plan. Instead, he reinstated Caleel and Associates' old plan. (Doc. 63-1 at 2.) After he resumed his premium payments, his policy number remained the same, he received the same reduced employee group rate, and he exercised a FIPA option included in his original policy. (Doc. 2 at 5; Doc. 60-1 at 2.) His ability to revive the plan with identical benefit options and at the special rate only "arose from the ERISA plan." *Glass*, 33 F.3d at 1347. As such, Harman's reissued policy is the same as the one he obtained through Caleel and Associates during his employment. In other words, Harman's original policy that Caleel established sprung back into force. (Doc. 63-1 at 2.)

Harman points out that he—not Caleel and Associates—paid the premiums on his policy after it reissued. (Doc. 83 at 3–4.) That is irrelevant though. *See Glass*, 33 F.3d at 1345 (disregarding plaintiff's arguments that he "paid the entire premium" after

8

conversion); *Clark v. Unum Life Ins. Co. of Am.*, 95 F. Supp. 3d 1335, 1352 (M.D. Fla. 2015) (discussing caselaw holding that "ERISA continues to govern a policy when the only change is a cessation of employment or a change in payment responsibility"). Nor is it important that Caleel and Associates has no active role in the policy post-conversion. *See Glass*, 33 F.3d at 1345–47 (finding a policy was governed by ERISA post-conversion without discussing the employer's role).

Similarly, Harmon's decision to convert to a nominally individual plan after his employment ended did not so transform the initial ERISA plan to one "that it is no longer part of an ERISA plan." *Id.* at 1346. While the Eleventh Circuit has not fully answered what changes to a plan may be so transformative as to remove it from the scope of the original ERISA plan, it held that—at the very least—the post-conversion changes must "actually create an individual policy." *Id.* at 1346. Somewhat counterintuitively, it is not enough for the post-conversion policy to be styled an individual plan. *See id.* at 1344, 1346 (noting that the plaintiff "elected to convert" to "an individual policy" and that the change "did not actually create an individual policy"). Like in *Glass*, Harmon's post-conversion plan was not truly an individual policy; Harmon received a special group rate that was only available to him because he had originally enrolled as a Caleel and Associates employee. (Doc. 59-2 at 43); *see Griggers v. Equitable Life Assur. Soc'y of the U.S.*, 343 F. Supp. 2d

9

1190, 1196 (N.D. Ga. 2004) (reasoning that ERISA continues to govern an individual policy that is removed from an ERISA-covered plan "where the ability of the beneficiary to obtain the conversion policy arises from the ERISA plan and the conversion policy remains 'integrally linked' with the ERISA plan"). Instead, Harmon's post-conversion plan was really "part of a group policy whose beneficiaries all had one thing in common—they had enrolled as [Caleel and Associates] employees in the original ERISA plan." *Glass*, 33 F.3d at 1346. Accordingly, Harmon's post-termination plan was not an individual plan; he simply moved to "a group policy of ex-[Caleel and Associates] employees." *Id.*

So too, Harmon's decision to add benefits to the base plan does not change that result. Harmon had the ability to add the extra benefits only because it was an option under the existing plan. As *Glass* explained, "a depended coverage feature"—like an option to increase benefits—"is part and parcel of the whole group insurance plan and thus ERISA governs it." *Glass*, 33 F.3d at 1345. Since Harmon "would not have been eligible for the converted policy," or the additional benefits, "had [he] not been enrolled in the ERISA plan," the converted policy "did not actually create an individual policy" and "continued to be integrally linked with the ERISA plan." *Id.* at 1346–47. As a result, ERISA governs Harman's converted policy because it arose from an ERISA-covered plan and has not been so transformed as to be an entirely new policy. *See Stern v. Provident Life & Accident Ins.*

10

*Co.*, 295 F. Supp. 2d 1321, 1326 (M.D. Fla. 2003) (Presnell, J.) ("Because the plans were established as ERISA policies, they remain subject to ERISA."); *see also Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 439–40 (8th Cir. 1997).

Finally, Harman points out that, when completing his policy-change application to increase potential benefits, an insurance agent selected "No" to the question about whether "the purpose of this insurance is to provide an Employee Benefit Plan as defined under ERISA." (Doc. 59-10 at 23.) According to Harman, this selection strongly indicates that ERISA does not govern his reissued policy. (Doc. 83 at 9.)

In determining whether ERISA governs a benefits plan, courts must consider whether a reasonable person would realize that the plain is an ERISA plan. *See Donovan*, 688 F.2d at 1373. But the reasonable-person test does not mean that a specific employee must know that ERISA governs a benefits plan. *Nicholas v. Standard Ins. Co.*, 48 F. App'x 557, 564 (6th Cir. 2002). Instead, the test means that "if a reasonable person in possession of the facts would be able to discern that a plan existed, then that plan is possibly (dependent on the other factors) an ERISA plan." *Id.* So the agent's selection on Harman's policy-change application is not dispositive.

Harman's reissued policy is the same as the one he obtained through Caleel and Associates during his employment. And the parties agree that ERISA governs Harman's

11

original policy. Thus, ERISA governs Harman's individual policy because it is the same as his original ERISA-covered plan. *See Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997).

In reaching a contrary result, the Magistrate Judge relied on cases concluding that ERISA ceases to govern converted plans, especially *Demars v. Cigna Corp.*, 173 F.3d 443 (1st Cir. 1999). Of course, *Glass*—not *Demars*—is controlling within the Eleventh Circuit. Yet *Demars* expressly criticizes *Glass*. *Demars*, 173 F.3d at 448–50. More problematic still is *Demars* reliance on policy-based reasoning to arrive at the conclusion that Congress did not intend to regulate insurance companies. *Id.* at 445–47; *see Griggers*, 343 F. Supp. 2d at 1194.

The statute defines an "employee welfare benefit plan" as one "established or maintained by an employer." 29 U.S.C. § 1002(1). But *Demars*, relying on ERISA's purpose, concluded that a policy is "established" when the employer has "ongoing administrative and financial ties to the policy." *Demars*, 173 F.3d at 450. This definition treats "established" as synonymous with "maintained" and, in doing so, reads the former out of the statute. *See* Black's Law Dictionary (11th ed. 2019) (defining "establish" as "to make or form; to bring about or into existence," and "maintain" as "[t]o continue (something)," to "care for (property)," or "to engage in general repair and upkeep");

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 26, at 174 (2012) (explaining that no word "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence"). Whatever the merits of legislative history to divine congressional purpose in general, it led the court in *Demars* to an untenable textual result. For that reason alone, this Court does not find *Demars* persuasive.

### ii.   ERISA Preempts State-Law Claim

Although his complaint fails to state the cause of action, Harman apparently alleges a claim for breach of contract against Standard. (*See* Doc. 2 at 1–3.) ERISA preempts this claim because it is based on Standard's decision to deny coverage and any liability against Standard derives from the ERISA-covered plan. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 212–14 (2004); *Garcon v. United Mut. of Omaha Ins. Co.*, 779 F. App'x 595, 598 (11th Cir. 2019). Harman's motion for partial summary judgment on the issue of whether ERISA applies is denied, and Standard's objection to the Report and Recommendation on this issue is sustained.

### iii.   No Right to Jury Trial under ERISA

ERISA is an equitable statute; so, it provides no right to a jury trial. *See Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1527 (11th Cir. 1996). Standard's motion for

summary judgment is granted on the issue of whether Harman has a right to a jury trial, and Standard's objection to the Report and Recommendation on this issue is sustained.

### b. Legal Disability Preceded Factual Disability

The Magistrate Judge recommended granting summary judgment in Standard's favor on whether Harman was legally disabled before he was factually disabled such that he could not recover benefits under the insurance policy. (Doc. 75 at 16–25.) After de novo review and considering the evidence that Harman cites in his objection to the Report and Recommendation, the Court agrees with the Magistrate Judge and adopts his recommendations about Harman's disability. (*Id.*)

Harman's insurance policy defines disability as follows:

You have a disability if, because of continuing sickness or injury, you:

> (1) are under the regular, reasonable and customary care of a physician; and
>
> (2) are unable to engage in your regular occupation; or are engaged in your regular occupation but, because of continuing disability, are not earning more than 85% of your prior average earned income; and
>
> (3) are earning not more than 85% of your prior average earned income from your regular or any other occupation.

(Doc. 2 at 8.)

In addition to the policy's clear language requiring that a "sickness or injury" cause

14

the inability to work, (*see id.*), disability insurance policies cover factual disabilities—not legal disabilities. *Pogue v. Nw. Mut. Life Ins. Co.*, No. 18-5291, 2019 WL 1376032, at *2 (6th Cir. Feb. 7, 2019); *see also Mass. Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 691 (2d Cir. 1997). A factual disability occurs when an illness or injury prevents someone from engaging in his occupation. *Pogue*, 2019 WL 1376032, at *2. In contrast, a legal disability exists if someone cannot work because a circumstance under the law prevents him from working even though he has the physical and mental ability to do so. *Id.*

Three questions guide resolution of whether a legal disability preceded a factual disability: "(1) is the claimed factual disability medically bona fide; (2) did the onset of the medically bona fide factual disability actually occur before the legal disability; and (3) did the factual disability actually prevent or hinder the person seeking disability benefits from engaging in his or her profession or occupation?" *Id.* at *3. A negative answer to any one of these questions prevents a claimant from recovering disability benefits. *Id.*

The Magistrate Judge concluded that Harman's factual disability did not actually occur before his legal disability because Harman failed to point to evidence showing that he was disabled before he relinquished his medical license in June 2015. (Doc. 75 at 18.) In February 2014, Harman self-reported to the Professional Resource Network (PRN) because Sarasota Memorial Hospital, where Harman had privileges, required him to do so

after the hospital received sexual-harassment complaints against Harman. (Doc. 59-4 at 1–2.) As part of his program with the PRN, Harman had to complete various tasks, including a psychological assessment, a psychiatric exam, polygraph tests, and report regularly to a case manager. (Doc. 59-4 at 4–21; Doc. 59-6 at 1–10.) The record is clear though on the cause of his initial involvement with the PRN: Harman began this program due to sexual-harassment complaints filed against him—not because he experienced a mental or physical sickness.

As recounted in the Report and Recommendation, Harmon did not successfully complete the program, including failing polygraph tests that inquired about his sexual conduct at work. (Doc. 75 at 18–20.) As a result, he voluntarily relinquished his Florida medical license in June 2015. (Doc. 59-9 at 1–2.) After that point, Harman began seeking treatment for depression-related symptoms, most notably from Dr. Matthew Edlund, who first saw Harman in January 2016. (*See, e.g.*, Doc. 19-1 at 26; Doc. 64 at 7.) Dr. Edlund eventually opined that it is "conceivable" that Harman had depressive symptoms in 2013. (Doc. 31-1 at 6.) Viewing these facts in the light most favorable to Harman, as well as others in the record, the Court concludes that his factual disability (depression-related symptoms) preceded his legal disability (voluntarily relinquishing his medical license).

The Second Circuit's opinion in *Millstein* is instructive. There, an attorney filed a

16

claim for disability under an insurance policy, claiming he suffered from Attention Deficit Disorder (ADD), conduct disorder, and chemical dependency. 129 F.3d at 689. After his law license was suspended because of criminal proceedings related to misuse of client funds, the attorney applied for disability and claimed that his ADD, conduct disorder, and chemical dependency resulted in impaired judgment that caused him to commit the crimes that led to his suspension. *Id.* at 690. To support his claim, the attorney pointed to evidence showing that his substance abuse began when he was fifteen years old. *Id.* at 689. And he pointed to a post-suspension medical record that diagnosed him with ADD and conduct disorder and stated that the attorney suffered from those disorders his entire life. *Id.*

The court in *Millstein* concluded that the attorney's criminal conduct and resulting suspension—not any physical inability—caused his loss of earned income. *Id.* at 691. In arriving at its conclusion, the court noted that the attorney sought no treatment until his law license was in jeopardy. *Id.* The court also noted that the attorney practiced law for several years despite medical evidence showing he suffered from ADD, conduct disorder, and chemical dependency his entire life. *Id.* Considering that the attorney practiced despite his chemical dependency and that he testified that he could perform legal work if he had his license, the court concluded that, as a matter of law, the attorney's suspension caused his loss of earned income—not his chemical dependency. *Id.*; *see also Suarez v. Mass. Mut.*

17

*Life Ins. Co.*, 132 F. Supp. 2d 1382, 1386 (M.D. Ga. 2000) (concluding legal disability preceded factual disability where doctor lost his medical license the day before his claimed disability date), *aff'd*, 232 F.3d 216 (11th Cir. 2000); *Kocer v. N.Y. Life Ins. Co.*, 340 F. Supp. 2d 1351, 1358 (N.D. Ga. 2004) ("Where Plaintiff's legal disability preceded his factual disability, he cannot recover benefits under the group policy.").

Here, the Magistrate Judge correctly concluded that there are no genuine disputes of fact about whether Harman's legal disability preceded his factual disability. Harman sought no treatment for depression-like symptoms until *after* he relinquished his license. Further, like the attorney in *Millstein*, Harman continued to work as a cardiologist in Florida up until he relinquished his license—a fact that undercuts his contention that his factual disability preceded his legal disability.

In his objections, Harman cites evidence that he argues creates a genuine dispute of material fact about whether his legal disability preceded his factual disability. (Doc. 77 at 17–19.) But none of the evidence Harman cites shows that, before relinquishing his license, he was manifesting a sickness or injury while under the supervision of physician that prevented him from performing his regular occupation. (*See* Doc. 2 at 8.) Indeed, he cannot identify anything in the record to prove that he was diagnosed with depression, or a similar condition, before he surrendered his license. For instance, Harman cites Dr.

18

Theodore Treese's deposition testimony where he stated that Harman "could be" suffering from cognitive disorder or major depressive disorder. (Doc. 19-27 at 12.) Harman also cites Dr. Treese's statement that he formed no opinion on whether anything related to a psychiatric diagnosis caused Harman's issues in the workplace. (*Id.*) Ultimately, Harman fails to point to any testimony from Dr. Treese that Harman's mental-health issues caused his workplace issues.[4]

Harman also cites Dr. Edlund's deposition where he testified that it is "conceivable" that Harman had depressive symptoms in 2013 before Sarasota Memorial received sexual-harassment complaints against Harman in 2014. (Doc. 31-1 at 6.) But this equivocal testimony years later is insufficient to show that Harman's mental-health issues preceded his workplace issues or that they caused him to be unable to work. As a result, Dr. Edlund's testimony about what is "conceivable" fails to establish a genuine issue of material fact on whether Harman's legal disability preceded his factual disability.

Similarly, Harman cites journal entries he wrote in July 2014—after Sarasota

---

[4] Harman states that Dr. Terry Proeger diagnosed Harman with adjustment disorder, (Doc. 77 at 6), but without specifying when that diagnosis occurred or whether that disorder *caused* Harman to be unable to perform his job. Harman also fails to cite to where in the record that diagnosis is. *See Commodores Ent. Corp. v. McClary*, 822 F. App'x 904, 913 (11th Cir. 2020) ("To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." (quoting *LaChance v. Duff's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998))).

Memorial received a sexual harassment complaint and he was sent to the PRN program—
that discuss how the passing of his parents and his divorce negatively affected him. (Doc.
31-2.) But these entries, none of which discuss a diagnosis for depression or similar
condition, also fail to create a genuine issue of material fact about whether Harman's factual
disability preceded his legal disability.

Harman argues that the Magistrate Judge failed to properly consider Dr. Felix
Subervi's opinion dated March 2019. (Doc. 77 at 17–19.) Dr. Subervi opined that the death
of Harman's father, Harman's divorce, and Harman's inability to have children—events
that started in 2013—caused Harman to "lose his confidence and his desire to fight to get
back into the medical field again." (Doc. 31-3 at 9.) Dr. Subervi also opined that Harman
had affective disorder "in connection with the allegations against him, which continued
through the time of his polygraph examinations." (*Id.*) According to Dr. Subervi, Harman's
anxiety and affective disorder resulted in his failed polygraph examinations. (*Id.*) Dr.
Subervi also testified at his deposition in May 2019 that Harman's feelings of depression
might have resulted in Harman not knowing that what he was doing at work—in terms of
the sexual-harassment complaints—was inappropriate. (Doc. 19-59 at 15.)

The Magistrate Judge correctly recommended that Dr. Subervi's opinion from 2019
about the cause of Harman's workplace issues in 2014 is too speculative to be admissible.

20

See *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, [courts] may consider only that evidence which can be reduced to an admissible form."); *Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319 (S.D. Cal. 1994) (Rhoades, J.), *aff'd*, 76 F.3d 1059 (9th Cir. 1996) ("Retrospective expert testimony regarding the existence or onset of a mental illness is inadmissible speculation.").

And even if the Court considered Dr. Subervi's retrospective opinion that Harman "lost confidence" after he experienced issues in his personal life in 2013, that opinion is immaterial. In 2007, Sarasota Memorial received a complaint against Harman after he yelled at a female coworker. (Doc. 19-1 at 10.) And in 2012, Sarasota Memorial received a complaint against Harman for comments he made to a female nurse about her appearance. (*Id.* at 11.) Despite these issues—both of which predate the issues Harman experienced in 2013—Harman continued to work as a cardiologist. He also continued working as a cardiologist after he experienced his issues in 2013—albeit as part of the PRN program after Sarasota Memorial received the sexual-harassment complaints in 2014. What is more, while completing the PRN program, Harman reported no depressive symptoms and denied any depressed mood. (Doc. 59-10 at 31, 34–71.)

Even considering Dr. Subervi's opinion, the record evidence shows that it is undisputed that Harman performed his occupational duties until he relinquished his

license. *See Provident Life & Accident Ins. Co. v. Fleischer*, 26 F. Supp. 2d 1220, 1225 n.5 (C.D. Cal. 1998) (finding immaterial a medical opinion, prepared four years after lawyer submitted claim for disability benefits, stating that the lawyer suffered from bipolar disorder for sixteen years before the lawyer applied for disability benefits); *Millstein*, 129 F.3d at 691 (affirming district court's conclusion that doctor's legal disability preceded his factual disability despite medical opinion, obtained a year after doctor applied for disability, that found the doctor suffered from ADD and conduct disorder his entire life).

Finally, Harman argues that the Magistrate Judge overlooked evidence showing that Harman's depression prevented him from reinstating his Florida license or practicing invasive cardiology in another state where he holds medical licenses. (Doc. 77 at 24.) According to Harman, "an issue of material fact exists as to whether [his] 'factual disability' of major depression renders him disabled from practicing invasive cardiology in another state." (*Id.* at 24–25.) This argument is unavailing for multiple reasons. To begin, Harman's argument in his objection is undeveloped and lacks any citation to authority. *See Resol. Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]" (internal citation omitted)). Further, Harman failed to cite to any

22

evidence in his objection to support his undeveloped argument. *See Celotex Corp.*, 477 U.S. at 323. Lastly, this order discusses how there is no genuine dispute that it is Harman's relinquishing his license, which he did rather than continue working and complete the PRN program, that prevents him from working as a cardiologist—not his mental-health diagnoses. Harman also does not dispute that he has active medical licenses in Indiana and Illinois. And when renewing his Illinois license in 2017—*after* he was diagnosed with depressive disorders—Harman answered "no" to whether he had any condition that impaired his ability to perform the essential functions of his profession. (Doc. 59-10 at 77.) Therefore, this argument fails.[5]

In the end, no genuine dispute of material fact exists about whether Harman's legal disability preceded his factual disability. And, as a matter of law, Harman may not obtain disability benefits because his legal disability preceded his factual disability. So the Court will overrule Harman's objections to the Report and Recommendation on this issue.

## III.    Conclusion

ERISA governs Harman's insurance policy because his individual policy is the same

---

[5] The Magistrate Judge correctly pointed out that Harman failed to respond to Standard's argument that he is not entitled to disability benefits for the first three time periods listed on his disability application. (Doc. 75 at 24; Doc. 59-8 at 5.) Instead, the only time period at issue is from June 10, 2015, to the present. (Doc. 75 at 24.)

one he had with Caleel and Associates, and his former employer "established" that plan so as to fall under ERISA's preemptive sphere. Additionally, Harman's legal disability preceded his factual disability; so he may not recover disability benefits under his policy. Accordingly, the following is **ORDERED**:

1. The Report and Recommendation (Doc. 75) is **ADOPTED-IN-PART**. Standard's objection to the report's resolution on the issue of whether ERISA governs Harman's insurance policy is **SUSTAINED**. The remaining objections are **OVERRULED**.

2. Standard's motion for summary judgment (Doc. 59) is **GRANTED**.

3. Harman's motion for partial summary judgment (Doc. 60) is **DENIED**.

4. Counsel's motion to withdraw (Doc. 78) is **DENIED as moot**.

5. The Clerk is directed (1) to enter judgment for Standard against Harman, (2) to terminate any pending motions, and (3) to close the case.

**ORDERED** in Tampa, Florida, on September 30, 2021.

Kathryn Kimball Mizelle
United States District Judge

24